UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FELIX MARTINEZ, *et al.*,

        Plaintiffs,

vs.                                  Case No. 8:03-CV-1197-T-27TGW

PAVEX CORPORATION,

        Defendant.

_____/

### ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment as to Remaining

Claims of Plaintiffs Alejandro Vazquez-Falero, Diosdado Perez, Isbel Perez, Narciso Perez and

Raphael Perez (Dkt. 32) and Plaintiffs' Memorandum in Opposition to Defendant's Motion for

Summary Judgment (Dkt. 38).

### Introduction

Alejandro Vazquez-Falero, Diosdado Perez, Isbel Perez, Narciso Perez and Raphael Perez

(collectively "Plaintiffs") allege that Pavex Corporation (hereafter "Pavex" or "Defendant")

discriminated against them on the basis of their race (Hispanic) by subjecting them to a hostile work

environment in violation of 42 U.S.C. § 1981. (Dkt. 13 (Substituted Complaint); Dkt. 21 (More

Definite Statement)).[1]  Plaintiffs also allege Defendant intentionally inflicted emotional distress on

them and tortiously interfered with business relationships they enjoyed with various trucking

---

[1] Defendant has filed a separate motion for summary judgment against Plaintiffs Luis Abrahantes
and Alejandro Lluberes.  (Dkt. 30).

companies, including Manny Transport, Inc.  Additionally, N. Perez alleges Defendant negligently retained and supervised its employee, Tony Hill, and should be held vicariously liable for an assault and battery Hill committed at Pavex's asphalt production facility.

Defendant moves for summary judgment on all of Plaintiffs' claims.  (Dkt. 32).  Upon consideration, Defendant's motion is DENIED as to Plaintiffs' claims for hostile work environment and N. Perez's claim for assault and battery.  Defendant's motion is GRANTED as to Plaintiffs' claims for intentional infliction of emotional distress, tortious interference with an advantageous business relationship and N. Perez's negligent supervision and retention claim.

### Factual Background[2]

Pavex owned and operated an asphalt production facility in Bartow, Florida.  (Turner Aff., ¶ 3).  Plaintiffs were not employees of Pavex.  Rather, Plaintiffs delivered materials to Pavex's facility by accepting delivery assignments from trucking companies, such as Manny's Transport, Inc. (D. Perez, pp. 27-29; I. Perez, pp. 26-30, 32-34; R. Perez, pp. 36-38, 46; Vasquez-Falero, pp. 37-40; Estrada Aff. ¶¶ 14, 15).  Plaintiffs were either truck owners who leased their trucks to Manny's Transport, Inc. or drivers hired by the truck owners to make the deliveries.  (*Id*; Estrada Aff., ¶¶ 3, 14, 15).

Manuel "Manny" Estrada, former owner of Manny's Transport, Inc., averred that the truck owners were independent contractors who called Estrada daily to find out if he had delivery assignments.  *Id*. at ¶ 3.  The truck owners decided when and if they wanted to accept a delivery

---

[2] All evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1280 (11th Cir. 2004).

assignment. *Id*. at ¶ 8. Estrada paid the truck owners by the load.[3] *Id*.

Unless delayed, a delivery required no more than twenty minutes. (Dkt. 38, ¶ 4). In one twelve hour day, Plaintiffs often delivered loads to Lakeland, Largo, Homosassa, Brooksville, and to Pavex's Bartow facility. (D. Perez, pp. 29-30).

According to Plaintiffs, they were subjected to harassment while making deliveries to the Pavex facility from 1997 until February 1998. (Dkt. 38, ¶ 5). Plaintiffs allege Tony Hill, a Caucasian man named Mike, and others who Plaintiffs could not name, called them "motherfucking Cubans", "Cuban son-of -a-bitch", "Spanish son-of-bitch", "Spanish motherfucker", "fuck you Cuban", "Cuban asshole", "fucking Cuban hens" and "stupid fucking Cuban". (I. Perez, pp. 87, 91-92; N. Perez, pp. 61, 94-95, 131; D. Perez, pp. 144-146; R. Perez, pp. 126-128, 141; Vazquez-Falero, pp. 68-70, 90-91).

According to Plaintiffs, racial slurs were used frequently and were directed at them while they were performing their job. (R. Perez, p. 141 (called him "stupid fucking Cuban" because he took longer to get on the scale); I. Perez, pp. 87, 91-92 (called them "fucking Cuban hens" for speaking Spanish to each other in the coffee break room while waiting to have their tickets signed; N. Perez, pp. 129-132 (called him "son-of-a-bitch Cuban people" because he was delivering materials Pavex did not order). D. Perez testified that Hill used racial slurs "many, many times . . .[a]lmost every time [they] went". (D. Perez, p. 146). Vasquez-Falero testified Hill humiliated him

---

[3] According to Estrada, Pavex had no control over which trucks he employed to make a delivery or how much he paid the truck owners. (Estrada Aff., ¶ 8). However, if any customer reported a problem with a particular driver, he would not send that driver to that customer's site. *Id*. at ¶ 9. Estrada did not recall Pavex ever reporting a problem with a driver. (Estrada Aff., ¶ 9). Estrada's testimony in this regard is somewhat conflicting, however, because he also claims that on one occasion Hill called Estrada to say N. Perez was giving him a "hard time" and kept "getting in his face". (Estrada Aff., § 14).

"almost every day". (Vazquez-Falero, p. 133). While he could not remember exactly how many times Hill directed racial slurs at him, he estimated that it was somewhere between fifty and two hundred. (Vasquez-Falero, pp. 134-135). Juan Carlos Serafin, a Pavex employee, testified that Hill used racial slurs such as "shut up, you mother-fucking Cuban" in front of Plant Manager Frank Andre and Andre did nothing about it. (Serafin, pp. 109-110).

Plaintiffs claim Hill and other unnamed Pavex employees delayed their deliveries by telling them to call the trucking transport companies, making them wait to have their tickets signed, telling them to dump in a different location, or requiring them to weigh their loads more frequently. (R. Perez, p. 132-136; Vazquez-Falero, p. 65-66; N. Perez, pp. 96-99). I. Perez testified that Hill required Plaintiffs to weigh their loads on a regular basis, without cause, resulting in delays of more than an hour. (I. Perez, p. 72-73). D. Perez testified that "several times" Hill would tell them they had to use the back door, otherwise he would not sign their ticket. (D. Perez, p. 123). Vasquez-Falero testified that on one occasion Hill drove a fork lift in front of his truck and dumped a pallet in his path, nearly hitting his truck. (Vasquez-Falero, pp. 84-85, 90-91). R. Perez testified that Hill would throw his hard hat on the floor and spit tobacco at his feet. (R. Perez, p. 128-129). According to D. Perez, Caucasian drivers "got their tickets signed very quickly" while Hispanic drivers did not. (D. Perez, p. 144). The unnecessary delays and refusals to sign tickets occurred approximately twice a week. (R. Perez, p. 129).

Tony Hill was the Plant Operator at the Pavex facility during the relevant time period. Frank Andre was the Plant Manager and Hill's supervisor. Hill monitored and controlled the delivery process. (Hill, pp. 19-21). Hill was responsible for weighing the crushed aggregate and decided which drivers could dump their loads right away and which drivers had to wait to have their loads

weighed. (Hill, pp. 20-22; *see also* Andre, p. 38-40 (Plant Operator was "in charge of receiving the truck and determining whether it, [ ] the amount of aggregate was correct")). Hill was also responsible for signing the drivers' tickets either before or after they dumped the materials. (Hill, p. 20-21).[4]

According to Hill, he did not make drivers wait unnecessarily to have their tickets signed. (Hill, p. 21). Hill testified that he would refuse to sign tickets if he was told Pavex did not order the material. (Hill, pp. 25-26). On these occasions, Hill would stop the driver from dumping, "they would ask why, there was sometimes a language problem but [Pavex] usually had enough [ ] other drivers that were Spanish speaking there to explain to them, they would call their boss, their boss would talk to [Hill's] boss, it was handled from that point on." (Hill, p. 27). Hill testified that some drivers had to wait to have their loads weighed because asphalt loadout took priority over incoming aggregate. (Hill, p. 22). Hill testified that he does not remember using any "epithets about anyone's nationality, such as 'fucking Cuban'". (Hill, p. 40-41). In November 1998, Hill voluntarily terminated his employment with Pavex in order to accept a "higher paying position, in a higher field." (Hill, pp. 55-56, 89-90; *see also* Andre, p. 64).

Vaxquez-Falero testified that he complained about the harassment to his boss, Manny Estrada. (Vasquez-Falero, 92-93). D. Perez testified that he reported the harassment to Estrada "almost on a daily basis". (D. Perez, p. 60-61). R. Perez testified that he complained about the harassment to Estrada and asked Hill's supervisor, Frank Andre, to sign his ticket when Hill would

---

[4] Frank Andre, Kenny Buchanan, loader operators, lab personnel and dispatchers were also authorized to sign the drivers' tickets. (Hill, p. 25).

refuse to sign it. (R. Perez, p. 130).[5]   According to Estrada, he never received complaints about harassment from any of the Plaintiffs. (Estrada Aff., ¶ 13).

On February 17, 1998 a physical altercation occurred between Hill and two members of the Perez family. Hill testified that N. Perez and two of his grandsons were trying to deliver materials that Pavex did not want. (Hill, p. 51). According to Hill, he approached N. Perez to tell him not to dump the materials and N. Perez "got right in [his] face and said fuck you." (Hill, pp. 52, 68).  Hill then hit N. Perez's right eye. (Hill, p. 53).  Hill denied saying anything like "fucking Cuban" to N. Perez. (Hill, p. 51).

On the other hand, N. Perez testified that Hill approached him as he was about to dump his load and said "[s]hut up. Fuck you son-of-a-bitch Cuban people". (N. Perez, p. 131).  In response, D. Perez said "I'm sorry, my friend. Take it easy. I'll telephone Manny." (N. Perez, pp. 133-134). According to N. Perez, Hill hit him as he was turning towards the truck to get a cellular phone. (N. Perez, p. 134).  As a result of Hill's punch, N. Perez fell to the ground and began bleeding. (N. Perez, p. 135). D. Perez then "jumped on" Hill and they hit each other. (D. Perez., p. 152-53). Frank Andre was promptly notified of the altercation, the police were called, and Andre drove N. Perez to receive medical treatment. As a result of Hill's actions, Pavex suspended Hill for three days without pay. (Hill, p. 56). The Perez family pressed criminal charges against Hill for battery. (N. Perez, p. 169-171; Hill, pp. 55-56).

Plaintiffs admit that they ceased doing business with Manny's Transport, Inc. for reasons other than Hill's harassment. (D. Perez, pp. 50-53; R. Perez, pp. 74-75; I. Perez, pp. 65-67; Vazquez-

---

[5] N. Perez testified that he did not complain about Hill's mistreatment because he was afraid he would lose the Pavex delivery assignments. (N. Perez, p. 174).

Falero, p. 45, 123).  With the exception of N. Perez and R. Perez, Plaintiffs continued making deliveries to Pavex's Bartow plant after the February 1998 incident. (D. Perez, pp. 37-40, 51-52, 110-112; I. Perez, p. 66; R. Perez, pp. 86-88; Vasquez-Falero, pp. 62-63, 123; Estrada Aff., ¶ 14).

## Applicable Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed. R. Civ. P. 56.  The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997).  Judgment in favor of a party is proper where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on the issue before the Court. Fed. R. Civ. P. 56.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.  Plaintiff's evidence must be significantly probative to support his claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## Discussion

### 1.    Plaintiffs' Section 1981 Hostile Environment Claims

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have

the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white

citizens." 42 U.S.C. § 1981(a).[6] The phrase "make and enforce contracts" is broadly defined to

include "the making, performance, modification, and termination of contracts, and the enjoyment of

all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

A defendant who is not a plaintiff's employer may therefore be liable under § 1981 for interference

with the plaintiff's contractual rights with third parties. *See Zaklama, M.D. v. Mt. Sinai Medical*

*Center*, 842 F.2d 291, 294-295 (11th Cir. 1988) ( § 1981 broad enough to include situations where

parties do not "occupy a direct employment relationship").[7]

---

[6] Section 1981's protection includes discrimination based on race and "ancestry or ethnic characteristics". *See St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

[7] This case seemingly presents an issue of first impression, as the Eleventh Circuit has not addressed whether a plaintiff may bring a §1981 hostile work environment claim against a non-employer. In *Zaklama*, the plaintiff, a resident anesthesiologist, brought a §1981 wrongful discharge claim against a hospital that participated in but did not administer his medical residency program. The plaintiff was not employed by the hospital. *Zaklama*, 842 F.2d at 293. The Eleventh Circuit found that the defendant "was in a position to affect [the plaintiff's] employment [with a third party] and did affect his employment with its adverse evaluations". *Id.* at 295. The Court held that § 1981 is broad enough to include "situations" where the parties do not "occupy a direct employment relationship." *Id.*
    In *Zaklama*, the plaintiff and defendant's relationship was incident to the plaintiff's residency and the defendant, by virtue of evaluations of the plaintiff's performance, had impact on the plaintiff's residency program. Here, Plaintiffs were not employees of Pavex and had no direct contractual relationship with Pavex. While delivering loads of aggregate to Pavex, they were performing their contract with Manny's Transport, which was operated by Estrada. Pavex had no direct control over the business relationship between Plaintiffs and Manny's Transport, although Estrada avers in his affidavit that if a client complained about a driver, he would not send that driver to the client's work site. (*See* Estrada Aff., ¶ 9).
    Because of the distinction between the plaintiff and defendant's relationship in *Zaklama* and the relationship between Plaintiffs and Pavex, Plaintiffs' hostile work environment claim arguably does not present a "situation" warranting protection under § 1981 as envisioned by the Eleventh Circuit in *Zaklama*. Nonetheless, the rationale adopted in *Zaklama* is persuasive and supports a conclusion that §1981's protection is broad enough to protect a non-employee subjected to a hostile work environment claim against a non-employer defendant, even though the parties do not have a direct employment relationship. *See id.* at 294 (non-employer should not be able "to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service") *(citing Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)).

Plaintiffs allege they were subjected to a hostile work environment in violation of § 1981. In order to establish a racially hostile work environment claim under §1981, Plaintiffs must establish that (1) they belonged to the protected group at issue; (2) they were subjected to unwelcome harassment; (3) the harassment was based upon race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) Defendant is responsible for such environment under either a theory of vicarious or direct liability. *See Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1991) (*en banc*)).

Defendant contends summary judgment is proper because the alleged conduct was not sufficiently severe or pervasive and because there is no basis to hold Pavex liable for Hill's actions. This Court finds that reasonable minds could differ on whether the alleged conduct was severe or pervasive and a question of material fact precludes summary judgment with regard to Pavex's liability. Accordingly, summary judgment on Plaintiffs' hostile work environment claims is not proper.

### **Severe or Pervasive**

In determining whether harassment is sufficiently severe or pervasive to alter the terms and conditions of employment, both an objective and subjective test must be met. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993). A plaintiff must establish not only that he or she subjectively perceived the environment as hostile and abusive but also that a reasonable person would perceive the environment as hostile and abusive, considering the totality of the circumstances. *Gupta v. Fla. Bd. of Regents*, 212 F. 3d 571, 583 (11th Cir. 2000). The Supreme Court has identified several factors relevant to whether a work environment is hostile and abusive, including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically

9

threatening or humiliating (as opposed to a "a mere offensive  utterance"); and (4) whether it unreasonably interferes with the employee's job performance.  *Harris*, 510 U.S. at 23.

### (i.)    *Frequency & Severity*

Viewing the evidence in the light most favorable to Plaintiffs, they have established that Hill's use of racial slurs was frequent and severe.[8]  Plaintiffs testified that Hill addressed them with racial epithets "many, many times . . . [a]lmost every time" they made a delivery, on at least fifty occasions, over at least a seven month period of time.  While an isolated utterance of an epithet is insufficient to establish frequency, Plaintiffs testimony demonstrates that while Plaintiffs were at the Pavex facility, Hill's use of racial slurs was commonplace and overt, as opposed to a few offhand comments or simple teasing.  *See Miller*, 277 F.3d at 1276-77.  Moreover, the fact that Plaintiffs' job duties required them to come in contact with Hill frequently (if not every time they made a delivery to Pavex), weighs in favor of finding that the frequency element has been met.  *See Miller*, 277 F.3d at 1276 (finding frequency element met in part because plaintiff's duties required him to go into the service area and interact with the harasser on a daily basis).

Likewise, a reasonable jury could conclude that Hill's harassment was sufficiently severe. Hill was not Plaintiffs' supervisor *per se*, but while Plaintiffs were at the Pavex facility, Hill was

---

[8] This Court recognizes that it is not as clear whether the delays Hill allegedly imposed on Plaintiffs were objectively motivated by racial animus.  While Plaintiffs testified that Caucasian drivers were not subjected to the same delays, Hill maintains delays were an inevitable part of the delivery process and that he did not unnecessarily delay any driver.  Credibility determinations, such as this, are better left for the jury to resolve. *See Mason v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citations omitted) (on summary judgment, the court "draws all justifiable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence"). However, Hill's name calling, such as  "mother-fucking Cuban" "Cuban son-of-a-bitch" and "stupid Cuban", was undeniably intended to carry racial overtones.  This Court rejects Defendant's suggestion that these type of racial epithets are not objectively offensive because they are commonly experienced on blue collar construction work sites. *See Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358-9 (11th Cir. 1982) (finding racial slurs sufficiently pervasive despite defendant's contention that "nigger-rigged" was a commonly used term in the automobile business for a poorly repaired car and was not personal to plaintiff).

responsible for directing Plaintiffs' deliveries, determining whether they had to weigh their loads, and signing their delivery tickets. If Plaintiffs' testimony is believed, Hill used racial epithets in a derogatory and intimidating manner in connection with his duties and while scolding Plaintiffs about their job performance. This fact weighs in favor of finding that the severity element has been met. *See Miller*, 277 F.3d at 1277 (racist remarks made in derogatory and intimidating manner while berating Plaintiff about job performance sufficiently severe).

While the severity of the other harassing behavior, including delays in permitting the dumping of loads and signing tickets may be diminished by the fact that racial animus is not as apparent or as objectively apparent, when these less severe incidents are considered with Hill's racist remarks, a reasonable jury could conclude that Plaintiffs were subjected to a sufficiently severe hostile work environment. *See Mendoza*, 195 F.3d at 1246 ("courts should examine the conduct in context, not as isolated acts, and determine under the totality of circumstances whether the harassing conduct is sufficiently severe or pervasive"); *Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1524 (M.D. Fla. 1991) (each instance of alleged harassment should not be considered in isolation but must be viewed in the context of other events).

    (ii.)    *Whether the Conduct is Physically Threatening or Humiliating and Whether It Unreasonably Interfered with Plaintiffs' Job Performance*

Based on the record evidence, a reasonable jury could conclude that Plaintiffs were humiliated by Hill's conduct. Plaintiffs testified that Hill's actions upset and embarrassed them. Moreover, Vasquez-Falero testified that Hill drove a fork lift in front of his truck, dumped a pallet, and nearly hit his truck. R. Perez testified that Hill threw his hard hat down and spit at his feet. It is undisputed that in front of other drivers, Hill hit N. Perez, knocking him to the ground and causing him to bleed. These incidents, in conjunction with Hill spouting racial slurs, such as "fuck you

11

Cuban" or "shut up mother-fucking Cuban", could be found by a reasonable jury to be threatening or humiliating acts. *See e.g. Miller*, 277 F.3d at 1277 (finding humiliating element met where coworker's utterances were made in the course of reprimanding him in front of others).

Likewise, when the evidence is viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that Hill's harassment unreasonably interfered with Plaintiffs' job performance. "The Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable." *Miller*, 277 F.3d at 1277 (citing *Harris*, 510 U.S. at 22). Thus, the fact that Plaintiffs' contracts with the trucking companies were not terminated does not necessarily defeat their hostile work environment claim. Plaintiffs testified that the unnecessary delays coupled with racial epithets disrupted their ability to deliver materials to Pavex promptly. In light of the fact that Plaintiffs have demonstrated frequent, severe, and humiliating conduct, their testimony regarding interference is sufficient to relegate the issue of whether Hill's harassment was severe or pervasive to the jury. *See Miller*, 277 F.3d at 1277 ("having established the frequency, severity, and humiliating nature of the conduct, [plaintiff's] failure to establish convincingly how [the harasser's] conduct interfered with his duties is not fatal to his hostile work environment claim, given the totality of the circumstances").

**Basis for Holding Pavex Liable**

An employer is "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Miller*, 277 F.3d at 1278. "Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Id.* (citations omitted). Plaintiffs contend Pavex should be held vicariously liable because Hill was a supervisor with either

12

actual or apparent authority.  In the alternative, Plaintiffs contend Pavex should be held directly

liable because it knew or should have known of the harassment, but failed to take corrective action.

    (i)    *Vicarious Liability*

    In the context of Title VII,  a supervisor is generally considered an "agent" of the employer.

*See* 42 U.S.C. § 2000e(b).[9]  The Eleventh Circuit has held that the term "agent" should be liberally

construed to effect Title VII's remedial purpose.  *See Urquiola v. Linen Supermarket, Inc.*, 1995 WL

266582*2 (M.D.Fla. 1995) (citing *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11 th Cir.

1984)).  However, the Eleventh Circuit has not defined who is a supervisor for purposes of imposing

§ 1981 or Title VII liability.

    Other circuits disagree as to how broadly the term "supervisor" should be defined.  For

example, the Seventh and First Circuits define "supervisor" narrowly, requiring the authority to hire,

fire, demote, promote, transfer or discipline the employee.  *See Parkins v. Civil Constr., Inc.*, 163

F.3d 1027 (7th Cir. 1998); *Noviello v. City of Boston*, 398 F.3d 76, 95-96 (1st Cir. 2005) ("[w]ithout

some modicum of [the] authority [to hire, fire, demote, promote, transfer or discipline an employee],

the harasser cannot qualify as a supervisor for purposes of imputing vicarious liability to the

employer . . .").  In comparison, the Second Circuit has interpreted the term more broadly, justifying

vicarious liability where an individual exercises authority to make or oversee daily work

assignments.  *See Mack v. Otis Elevator Co.*, 326 F. 3d 116, 126 (2d Cir. 2003) (individual who

exercises authority to make and oversee daily work assignments of a plaintiff is a supervisor for

purposes of establishing employer's liability).

---

[9] Cases analyzing the requirements of a hostile work environment claim under Title VII are relevant and persuasive in this case as "both of these statutes [i.e., § 1981 and Title VII] have the same requirements of proof and use the same analytical framework".  *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002).

Here, since Plaintiffs were not employees of Pavex, Hill's supervisory status with respect to Plaintiffs, if any, cannot be easily analyzed under general supervisory principles in a traditional employer-employee setting. Nonetheless, the record establishes that Hill had no supervisory authority over Plaintiffs under either the broader or more narrow definition of "supervisor"utilized by the various Circuits. Those definitions connote some aspect of control over an employee's job performance, either ultimate control (termination, promotion, transfer, etc.) or control over job assignments. Hill had neither with respect to these plaintiffs.

While Hill may have had the ability to impact and even indirectly control how Plaintiffs delivered their loads when they arrived at the Pavex facility, he did not have the authority to hire, fire, demote, transfer, discipline or evaluate Plaintiffs' job performance. Nor did he have any control over Plaintiffs' daily delivery assignments. It is undisputed that Plaintiffs chose what delivery assignments to accept from the trucking companies. While Hill was capable of inconveniencing Plaintiffs' deliveries at Pavex and thereby disrupting their overall delivery schedules, Plaintiffs have not established that Hill had any control over their contractual relationship or status with the trucking companies or their ability to accept daily delivery assignments. Accordingly, Hill cannot be considered a supervisor for vicarious liability purposes.

    *(ii)    Direct Liability*

Where the perpetrator of harassment is not a supervisor but rather a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *Miller*, 277 F.3d at 1278 (citations omitted). "Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe or pervasive as to constitute constructive knowledge to the employer." *Id.* "Actual notice is established by proof that management knew of the harassment,

whereas constructive notice will be found where the harassment is so severe and pervasive that management should have known of it." *Id.*

Viewing the evidence in the light most favorable to Plaintiffs, there is a question of fact regarding whether Pavex had notice (actual or constructive) of Hill's use of racial slurs. Hill denied using racial epithets and Andre testified that the only incident he was made aware of was Hill's physical altercation with N. Perez on February 17, 1998. On the other hand, Pavex employee Juan Carlos Serafin testified that Hill used racial slurs such as "shut up, you mother-fucking Cuban" in front of Frank Andre and Andre did nothing about it. (Serafin, p. 109-110).[10] If Serafin's testimony is believed, a reasonable jury could conclude that Pavex's management knew of Hill's use of racial slurs (via Plant Manager Frank Andre's knowledge) but failed to take prompt remedial action. Thus, a genuine issue of material fact exists as to whether Pavex had notice of Hill's use of racial slurs and failed to take corrective action. Accordingly, summary judgment is not proper on Plaintiffs' hostile work environment claims.[11]

---

[10] Q:   Other than this one-time punch, did Tony Hill do or say anything to you that you felt was discriminatory?
A:   Oh yes, yes. It would be when we would be sitting down and talking in a group, he would yell real loud and he would say, "Shut up, you mother-fucking Cuban. . . .

* * *

Q:   Did you say you complained to Frank about Tony [Hill]?
A:   He [Hill] would do it in front of Frank.
Q:   Frank didn't do anything?
A:   No, nothing.
(Serafin, pp. 109-110).

[11] Serafin's testimony also creates an issue of material fact regarding Defendant's assertion that its response to Hill's physical altercation with N. Perez in February 1998 was corrective and exonerates them of liability. If Serafin's testimony is believed, a reasonable jury could conclude that in addition to being aware of the February1998 incident, Pavex knew or should have known about Hill's overt use of racial slurs but choose to ignore it.

2.   **Intentional Infliction of Emotional Distress**

In order to prove a claim for intentional infliction of emotional distress, Plaintiffs must establish (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the complained of conduct caused the suffering; and (4) the suffering was severe. *See Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985). Conduct is considered "outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 278; *see also Eastern Airlines, Inc. v. King*, 557 So. 2d 574, 576 (Fla. 1990) (citing § 46, Restatement (Second) of Torts (1965)). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'". *Eastern Airlines*, 557 So. 2d at 576 (citing § 46, Restatement (Second) of Torts (1965)).

"The issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim of intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law." *Baker v. Florida National Bank*, 559 So. 2d 284, 287 (Fla. 4th DCA 1990) (citations omitted). Defendant contends summary judgment on Plaintiffs' intentional infliction of emotional distress claim is appropriate because the alleged conduct was not sufficiently outrageous and because Defendant cannot be held vicariously liable.

### Extreme or Outrageous Conduct

The conduct complained of by Plaintiffs, namely, the repeated use of racial slurs and unjustified delays, while reprehensible, does not meet the high standard imposed by Florida courts for intentional infliction of emotional distress claims. *See Vance v. Southern Bell Telephone and*

*Telegram Company*, 983 F.2d 1573, n.2 and n. 7 (11th Cir. 1993); *Williams v. Worldwide Flight Svcs. Inc.*, 877 So. 2d 869 (Fla. 3d DCA 2004); *Lay v. Roux Laboratories Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980).

In *Vance, Williams* and *Lay*, more severe racially hostile conduct was deemed insufficient to establish a claim for intentional infliction of emotional distress. In *Vance*, the plaintiff was suspended, her work was sabotaged, she was "intentionally transport[ed] to the wrong hospital during her nervous breakdown in an effort to cause her further trauma", a noose was hung over her work station and her doctor's request to have her transferred to a different department was refused. *Vance*, 983 F.2d at n.2. In *Lay*, the defendant launched vicious verbal attacks on the plaintiff, called plaintiff a "nigger", and threatened her with the loss of her job. *Lay*, 379 So. 2d at 452. In *Williams*, the plaintiff's supervisor called the plaintiff a "nigger" and "monkey", falsely accused the plaintiff of stealing, and constantly threatened plaintiff with termination. *Williams*, 877 So. 2d at 870; *see also Mundy v. Southern Bell Telephone and Telegraph Co.*, 676 F.2d 503, 504 (11th Cir. 1982) (intentional infliction of emotional distress claim dismissed where plaintiff's superiors threatened to "get" plaintiff or destroy his career, transferred him to less desirable job assignments, gave him unfair negative evaluations and refused to approve reimbursement for legitimate business expenses after plaintiff refused to participate in a scheme to falsify expense vouchers); *Vamper v. United Parcel Service, Inc.*, 14 F.Supp.2d 1301, 1306 (S. D. Fla. 1998) (intentional infliction of emotional distress claim dismissed where, among other acts of hostility, supervisor told employees false story about plaintiff and referred to plaintiff as a "nigger" in Spanish).

Here, Plaintiffs allege that a Pavex employee who lacked the authority to fire or demote them repeatedly used racial slurs and delayed and inconvenienced them while they delivered materials to the Pavex facility. This conduct is not sufficiently extreme and outrageous to constitute a claim for

intentional infliction of emotional distress. *See Vance*, 983 F.2d at n. 2 and n.7; *Williams,* 877 So.2d at 870; *Lay*, 379 So. 2d at 452; *Vamper*, 14 F.Supp.2d at 1306; *compare Ford Motor Credit Co. v. Sheehan*, 373 So. 2d 956, 959-60 (Fla. 1st DCA), *cert. dismissed*, 379 So. 2d 204 (Fla. 1979) (conduct sufficiently outrageous where creditor, in attempting to locate debtor, falsely represented to debtor's mother that debtor's children had been involved in a serious automobile accident). Plaintiffs therefore fail to establish a *prima facie* case of intentional infliction of emotional distress.[12]

### 3.   Tortious Interference with an Advantageous Business Relationship

Under Florida law, the elements of an tortious interference claim are: (1) the existence of a business relationship affording the plaintiff existing or prospective legal rights; (2) the defendant's knowledge thereof; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff. *See International Sales & Service, Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1155 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994)). Either a "breach" or "termination" of a business relationship is necessary to establish "interference." *See Anthony Distributors, Inc. v. Miller Brewing Company*, 941 F.Supp. 1567, 1572 (M.D. Fla. 1996) (citing *Smith v. Ocean State Bank*, 335 S. 2d 641 (Fla. 1st DCA 1976); *Ethan Allen*, 647 So.2d at 814; *Greenberg, M.D. v. Mount Sinai Medical Center*, 629 So.2d 252 (Fla. 3d DCA 1993); *West v. Troelstrup*, 367 So.2d 253 (Fla. 1st DCA 1979)).

Here, Plaintiffs testified that their relationship with Manny's Transport, Inc. ended for reasons other than Hill's harassment. Accordingly, their contracts were not breached or terminated due to the harassment they allegedly suffered at the Pavex facility. Plaintiffs therefore fail to establish a necessary element of their interference claims. Accordingly, Defendant's motion for

---

[12] Since the alleged conduct is not sufficiently extreme or outrageous as a matter of law, it is unnecessary to address Defendant's alternative ground for dismissal of this claim.

summary judgment on Plaintiffs' tortious interference claims is granted.

**4.      N. Perez's Assault & Battery Claims**

Under Florida law, "assault is defined as an intentional, unlawful offer of corporal injury to another by force, or force unlawfully directed toward another under such circumstances as to create a fear of imminent peril, coupled with the apparent present ability to effectuate the attempt." *Lay v. Kremer*, 411 So.2d 1347, 1349 (Fla. 1st DCA 1990).   Battery consists of the intentional infliction of a harmful or offensive contact upon the person of another. *See Chorak v. Naughton*, 409 So. 2d 35 (Fla. 2d DCA 1981).   For purposes of establishing *respondeat superior* liability for either cause of action, an employee's conduct must have been within the scope of his employment; thus, the conduct must: (1) have been the kind he was employed to perform; (2) have occurred within the time and space limits of his employment and (3) must have been activated at least in part by a desire to serve the master.  *Ayers v. Wal-Mart Stores, Inc.*, 941 F.Supp. 1163, 1168 (M.D. Fla. 1996) (citing *Sussman v. Florida East Coast Properties, Inc.*, 557 So. 2d 74, 75-76 (Fla. 3d DCA), *rev. denied*, 574 So. 2d 143 (Fla. 1990)).

N. Perez's assault and battery claim is premised on the February 1998 physical altercation between himself and Hill.  According to Hill, he approached N. Perez to tell him not to unload his truck because Pavex did not order the material.  Hill testified that N. Perez "got right in [his] face and said fuck you" and then Hill hit N. Perez's right eye.   Contrary to Defendant's assertion, it is not clear whether Hill's battery was motivated by personal reasons, perhaps in response to N. Perez saying "fuck you", or whether he was in part motivated by the purpose of serving Pavex, namely, Pavex's interest in not receiving materials it did not order.  Accordingly, an issue of material fact exists as to whether Hill's tortious actions "in some way furthered the interests" of Pavex or were "at least motivated by a purpose to serve" Pavex's interest, rather than Hill's personal interests.  *See*

*Ayers*, 941 F.Supp. at 1169 (granting defendant's summary judgment, but recognizing that a plaintiff may defeat summary judgment where factual issues exists as to whether employee's tortious action "in some way furthered the interest of defendant" or were "at least motivated by a purpose to serve" defendant's interest); *see e.g. Columbia by the Sea, Inc. v. Petty*, 157 So.2d 190 (Fla. 2d DCA 1963) (jury question created as to scope of employment where *maitre d'* struck customer after customer failed to pay bill and called *maitre d'* a "bastard"). Accordingly, Defendant's motion for summary judgment on N. Perez's assault and battery claim is denied.

### 5.    N. Perez's Negligent Supervision and Retention Claim

In Florida, negligent supervision and retention occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicates his unfitness and the employer fails to take further action such as investigation, discharge, or reassignment. *See Watson v. The City of Hialeah*, 552 So.2d 1146, 1148 (Fla. 3d DCA 1989). Liability attaches when an employer (1) knows or should know about the offending employee's unfitness and (2) fails to take appropriate action. *See Garcia v. Duffy*, 492 So.2d 435, 438-439 (Fla. 2d DCA 1986). A negligent supervision and retention claim "must be based on an injury resulting from a tort which is recognized under common law." *Scelta v. Delicatessen Support Services, Inc.*, 57 F.Supp.2d 1327, 1348 (M.D. Fla. 1999). Here, the only injury alleged by N. Perez that resulted from a tort which is recognized under common law is his allegation of injury as a result of Hill's assault and battery.[13]  Defendant correctly argues that N.

---

[13] In the Substituted Complaint, N. Perez alleges injury as a result of Hill's "racial and ethnic discrimination, harassment and retaliation, assault, battery, intentional interference with advantageous relationship, and intentional infliction of emotional distress." (Substituted Complaint, Dkt. 13, pp. 10-11). As discussed *supra*, N. Perez's claims for intentional infliction of emotional distress and intentional interference with an advantageous business relationship are dismissed. N. Perez does not allege a retaliation claim. More significantly, N. Perez fails to establish that any type of discrimination qualifies as an independent underlying tort sufficient to support a claim for negligent supervision and retention. *See. e.g. Latson v. Hartford Ins.*, 2006 WL 485097 *5 (M.D. Fla. 2006) (sexual harassment is not recognized as an independent underlying tort under Florida law for purposes of bringing a negligent retention and supervision claim). Accordingly, N. Perez's assault and battery claim is the only independent tort which can support his negligent supervision and retention claim.

Perez fails to submit evidence demonstrating that Pavex had actual or constructive knowledge of Hill's propensity to assault or batter others. Whether Pavex had actual or constructive knowledge of Hill's use of racial slurs is irrelevant, as any such knowledge would not be sufficient to put Pavex on notice of Hill's unfitness (the propensity to assault or batter) that provides the independent tort on which N. Perez's negligent retention and supervision is based. *See Latson v. Hartford Ins.*, 2006 WL 485097 *5 (M.D. Fla. 2006). Defendant's motion for summary judgment on N. Perez's negligent supervision and retention claim is therefore granted.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.    Defendant's motion for summary judgment on Plaintiffs' § 1981 hostile work environment claims is DENIED.

2.    Defendant's motion for summary judgment on Plaintiffs' intentional infliction of emotional distress claims is GRANTED.

3.    Defendant's motion for summary judgment on Plaintiffs' tortious interference with an advantageous business relationship claims is GRANTED.

4.    Defendant's motion for summary judgment on N. Perez's assault and battery claim is DENIED.

5.    Defendant's motion for summary judgment on N. Perez's negligent supervision and retention claim is GRANTED.

**DONE AND ORDERED** in chambers this 22nd day of March, 2006.

                                        **JAMES D. WHITTEMORE**
                                        **United States District Judge**

Copies to:
Counsel of Record